2016 9.20 Schenkier_Youn_v_Sklar

1

```
 1              TRANSCRIBED FROM DIGITAL RECORDING
 2          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4   JAMES YOUN, M.D., ex rel        )
     United States of America and    )
 5   the State of Illinois,          )
                                     )  Case No. 10 CV 5583
 6            Plaintiff,             )
     -vs-                            )  Chicago, Illinois
 7                                   )  September 20, 2016
     KEITH D. SKLAR, individually,   )  9:28 a.m.
 8   et al.,                         )
                                     )
 9            Defendants.            )
10            TRANSCRIPT OF PROCEEDINGS
11   BEFORE THE HONORABLE SIDNEY I. SCHENKIER, MAGISTRATE JUDGE
12   APPEARANCES:
13   For the Plaintiff:   MS. ROBIN B. POTTER
                          MR. CHARLES MASON KLEIN III
14                        Robin Potter & Associates, P.C.
                          111 East Wacker Drive
15                        Suite 2600
                          Chicago, IL  60601
16                        (312) 861-1800
                          E-mail:  Robin@potterlaw.org
17                                 Mason@potterlaw.org
18
19   **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
       NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
20            PORTIONS UNINTELLIGIBLE AND INAUDIBLE
21   Transcriber:
22        KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                  Official Court Reporter
23              United States District Court
          219 South Dearborn Street, Suite 2524-A
24              Chicago, Illinois  60604
                Telephone:  (312) 435-5569
25            Kathleen_Fennell@ilnd.uscourts.gov
```

2

```
 1   APPEARANCES:  (Continued)
 2   For the Plaintiff:   MR. L. STEVEN PLATT
                          Robbins, Salomon and Patt, Ltd.
```

2016 9.20 Schenkier_Youn_v_Sklar
```
                          180 N. LaSalle Street, Suite 3300
 3                        Chicago, IL  60601
                          (312) 456-0285
 4                        E-mail: Lsplatt@rsplaw.com
 5
     For the Defendants:  MR. MICHAEL JOSEPH KRALOVEC
 6                        MR. DANIEL C. MEENAN, JR.
                          Kralovec Meenan LLP
 7                        53 West Jackson Boulevard
                          Suite 1102
 8                        Chicago, IL  60604
                          (312) 788-1111
 9                        E-mail: Mkralovec@nlklaw.com
                                  Dmeenan@dcmjd.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1        (Proceedings heard in open court:)
 2            THE CLERK:  Case No. 10 C 5583, Youn versus Sklar, et
 3   al., status and motion hearing.
 4            MS. POTTER:  Good morning, Judge.  Robin Potter for
 5   the plaintiff.
 6            MR. PLATT:  Steven Platt for the plaintiff.
 7            MR. KLEIN:  Charles Klein for the plaintiff.
```

2016 9.20 Schenkier_Youn_v_Sklar
```
 8            MR. KRALOVEC:  Good morning, Your Honor.  Michael
 9   Kralovec for Dr. Sklar.
10            MR. MEENAN:  Good morning, Judge.  Dan Meenan for the
11   defendants.
12            THE COURT:  Good morning.
13            So we have this case for status.  We also have
14   plaintiff's motion for leave to conduct additional limited
15   fact discovery which was filed a couple weeks ago, so I take
16   it you've had a chance to take a look at it.
17            MR. MEENAN:  Yes.  We didn't respond in writing, but
18   we're certainly prepared to do that if Your Honor wants to
19   handle it that way.
20            THE COURT:  Yeah, has there been any conversation
21   since the filing of the motion about any of the things raised
22   in the motion?
23            MR. MEENAN:  No.
24            THE COURT:  Okay.  Well, we can start marching
25   through it if you want to do it that way.
```

4

```
 1            MR. MEENAN:  That's fine, Judge.  We're prepared to
 2   talk about what they're raising.
 3            THE COURT:  Okay.  So there are a number of things
 4   raised in the motion.  One question I have was that the motion
 5   attached Ms. Potter's Rule 37.2 letter.  There wasn't anything
 6   from the defense in writing.  Was there a response in writing
 7   to that letter?
 8            MR. MEENAN:  I'm trying to remember what the subject
 9   of that letter was.  We've had discussions about most of these
10   issues.
11            MS. POTTER:  It was post-dep and continued the
```

2016 9.20 Schenkier_Youn_v_Sklar
```
12   Rule 37 from the dep, and there was no response, verbal,
13   written, anything.
14            THE COURT:  All right.  So one of the items or one of
15   the issues raised was, I guess, discovery concerning
16   defendants' critique of plaintiff's audit and expert report.
17            MR. MEENAN:  Yes, and here's if I can lay out the
18   scenario, Judge.
19            THE COURT:  Sure.
20            MR. MEENAN:  We appeared for Dr. Sklar's deposition
21   at 9:00.  These discussions began about 4:30.
22            There had been a commitment midday that Dr. Sklar
23   would be excused by 5:15 or thereabouts for another session.
24   At about 4:30, he was presented with Dr. Warshaw's expert
25   report, and he indicated that he had seen it, but he later
```

5

```
 1   indicated that he'd not had an opportunity to review it.  At
 2   that point, he was asked to begin reading a 38-page report,
 3   and the prefatory questions had been that he was going to then
 4   be asked to immediately sit there and critique it, which we
 5   felt was inappropriate under those circumstances for any
 6   number of reasons.
 7            We actually attempted to reach out to Your Honor.  I
 8   think both sides indicated that if either wanted to pursue the
 9   matter by way of a protective order, we would do that.
10            I don't know that they have a right to simply hand
11   the defendant an expert report and tell him to read it and
12   critique it if he hasn't done that in advance.  None of the
13   disclosures about Dr. Sklar's potential opinion testimony
14   related to Dr. Warshaw's report.
15            At the time of the deposition, I had sent it on to
16   his assistant, Ms. O'Keefe.  I don't know that Dr. Sklar had
```

2016 9.20 Schenkier_Youn_v_Sklar

17  even read the thing.  So that was the situation with that.
18        We asked that any other questions be finished.  I
19  don't know whether there were any others that related to
20  anything other than the report or not, but that's where the
21  situation was left with respect to the report and a suggestion
22  that Dr. Sklar had some obligation to specifically critique
23  their retained expert report.
24        THE COURT:  All right.  Well, there are two things.
25  One is the audit, one is the expert report.

6

1        MR. MEENAN:  Are you talking about the spreadsheets?
2        THE COURT:  Yes.
3        MR. MEENAN:  Yes.
4        THE COURT:  So let's pause for a moment on the expert
5  report because I want to make sure that we keep them separate.
6        All right.  On the expert report, is there anything
7  further that on the plaintiff's side you wish to say?
8        MR. PLATT:  Well, Exhibit 4 just spells it out, Your
9  Honor, how this dispute arose, and it starts at Page 262, 261.
10  I was asking him what documents he looked at earlier on in
11  preparation for the deposition, and then I said that he
12  mentioned on 261, I said at line 20:  You mentioned the
13  expert's report.  I was talking to him about what documents he
14  used in preparation for the deposition.  And he said, oh.  And
15  I said was that one of the documents that he looked at, and he
16  said, okay, so this is his.  And he says yeah, I mean, he
17  looked at that in preparation for the deposition.  Then he
18  says yeah, I did look at it.
19        And then he says -- and then I said let me start
20  over.  Did you see a copy of this report, if you know, and he

Page 5

2016 9.20 Schenkier_Youn_v_Sklar

21  says I did.  Can you tell me what, if anything, this report
22  you disagree with aside from everything because he was
23  disagreeing with everything.
24        And then he says -- then he goes on and he says have
25  you looked at it, and he was getting a little bit hyper, so I

7

1  told him to calm down, take a deep breath, relax, and tell him
2  he's not under any time pressure.  I was just asking him for
3  his basic critique, since he says he looked at it in the prep
4  for the deposition.
5        And then he says on Page 263, line 8, he says, he
6  didn't see any of my patients, he doesn't know what any them
7  look like, he didn't see any pictures of the patient, how can
8  he describe medical necessity, and then as he's getting into
9  that, Mr. Meenan interrupts.  He says, I'm going to object.
10  You're handing him a report, an expert's report, and
11  apparently asking him to critique it.  Well, he had already
12  started testifying that he had seen it, and he was testifying
13  about what he didn't agree with.
14        So then Meenan objects again at the bottom of
15  page 263 --
16        THE COURT:  Yeah, I can see.
17        MR. PLATT:  Yeah, and he goes on and on.  And then
18  pretty soon he's saying. I'm not going to let him testify
19  about anything.  And I told him, I said, do you want to go off
20  the record and take a break and let him look at it under his
21  own power, on 264.  And then, you know, taking his counsel's
22  lead, he says, well, maybe I didn't see this.  And then he
23  says, I'm not going to let him talk about it.  You can take it
24  up with the judge.
25        Well, that's a pretty substantial flip flop, and it

Page 6

2016 9.20 Schenkier_Youn_v_Sklar

8

1  was counseling of the witness.  And in any event, he says if
2  he goes out and he looks at it on his own, the deposition's
3  going to be over.  Take it up with the judge.  I mean, that's
4  really improper.
5        THE COURT:  And here we are.
6        MR. MEENAN:  I don't know what the last comment
7  meant.  My problem was giving a witness at the very end of a
8  deposition a 38-page report that he said he had seen but he
9  hadn't really read and asking him to read it at the deposition
10  and then critique it when he's supposed to be excused within a
11  half an hour of the question coming up in the first place.
12        THE COURT:  Well, let me -- let's kind of cut to the
13  chase on this.  And the reason I was distinguishing this from
14  the spreadsheet is because his testimony about the spreadsheet
15  is different.  That he clearly made some study of, he said he
16  made notes of.
17        It's different to study something, analyze it, make
18  notes on it, than it is potentially to look at it, which is
19  what he said at Page 261 with respect to the expert report.
20        Now, in fairness, at 263, he starts talking about
21  criticisms he had of the expert report that certainly suggest
22  he looked at it enough to know that there were things in it
23  that he thought rendered it defective, okay?
24        Now, whether he looked at it beyond a macro level,
25  while they didn't -- you know, the guy didn't see patients, he

9

1  didn't see pictures, you know, you don't have to study a
2  38-page report to know that that's a criticism you have.

Page 7

2016 9.20 Schenkier_Youn_v_Sklar

3  On the other hand, it's another thing to say, okay,
4  now I want you to read every word, every page of the 38-page
5  report late in the deposition if it's clear that the person's
6  not going to be there past 5:15.
7        Now, this is at about 4:30?
8        MR. MEENAN:  Yes.
9        THE COURT:  Okay.  I don't know.  If I really read
10  every word of a 38-page report, I might not be done in
11  40 minutes, right?  It can be kind of dense stuff.
12        MR. MEENAN:  It's a detailed report.
13        THE COURT:  A minute a page, that's kind of pretty
14  quick.
15        MS. POTTER:  I think, Judge, in context --
16        THE COURT:  I think I'd like to finish.
17        MS. POTTER:  I'm sorry.
18        THE COURT:  That's okay.
19        So I think that you guys all kind of got sidetracked.
20  He clearly had looked at it, he clearly had some opinions
21  about it, and I think they're entitled to know that, and if
22  that's a criticism, why he has that criticism or are there
23  other criticisms?
24        I know that it's not part of his non-retained expert
25  opinion, but that's because he's being offered in that

10

1  capacity a little bit different.  I don't know that you won't
2  offer him the comment on this report, on their expert report.
3  So I think they are entitled to know what his opinions are.
4        Now, that doesn't mean if he's not looked at it in
5  greater detail, then to say all I need to know is that no
6  expert can really do a good report that's meaningful if they
7  don't see the patient or they don't see pictures.  If that's

Page 8

2016 9.20 Schenkier_Youn_v_Sklar

8   his sole criticism, so be it.  Then it's really short, okay?

9        He's not a 30(b)(6) witness on the expert report,

10  okay?  So it's kind of, I guess, up to you, you know, knowing

11  what he has already done, what you might want him to do, how

12  big a job that's going to be.  But I think they are entitled

13  to know on that.

14      MR. MEENAN:  So that would be the remaining

15  40 minutes or so?

16      THE COURT:  Well, we're not done.

17      MR. MEENAN:  Oh, I'm sorry.

18      THE COURT:  You guys are all, you know, in such a

19  hurry, you know?

20      You know, with respect to the spreadsheet, it appears

21  that he says he did make notes of things in the spreadsheet

22  that he had criticisms about.

23      I think there's some clarification that

24  may be necessary, if I may, Judge.  I don't want to interrupt

25  you.

                                11

1      THE COURT:  That's okay.  Go ahead.

2      MR. MEENAN:  There's -- the documents that have been

3  referred to as spreadsheets are four separate spreadsheets

4  that were provided as answers to interrogatories.  What came

5  up at the deposition was explored much more in detail with

6  Ms. O'Keefe than with Dr. Sklar.

7      What they're referring to there is a simple analysis

8  that Melissa O'Keefe did of all of the wart treatments that

9  occurred during a period of time.

10      THE COURT:  I apologize, the internal audits.

11      MR. MEENAN:  Yes.  It's a different --

                         Page 9

---

2016 9.20 Schenkier_Youn_v_Sklar

12      THE COURT:  Thank you for the correction.

13      MR. MEENAN:  The spreadsheets generically have a life

14  of their own.

15      THE COURT:  Yes.

16      MR. MEENAN:  What Ms. O'Keefe testified in some

17  detail about that analysis and she said what she simply did is

18  physically went in and added up the number of wart patients

19  and the number of treatments and divided and got the 4.4

20  average.  She said she had not prepared any documents.  I

21  think she said she hadn't even kept any notes of it.  It was

22  just an internal analysis that they did, and that was the

23  beginning and the end of it.

24      When it came up with Dr. Sklar, he simply repeated

25  what Melissa O'Keefe had told him, which they had explored at

                                12

1  the deposition, so there is nothing to give them.  And to the

2  extent there was --

3      THE COURT:  Can I read to you from the deposition?

4      MR. MEENAN:  Yes.

5      THE COURT:  Page 259:  You mentioned you did this

6  internal audit of yourself on the wart treatments to come up

7  with an average.  That's what we're talking about.

8      MR. MEENAN:  Yes.

9      THE COURT:  Okay.  Have you done any other internal

10  analysis in response to any claims being made against you?

11      I did nothing.

12      Okay.  Have you looked at the spreadsheets -- now

13  we're back to spreadsheets.  Have you looked at the

14  spreadsheets that our side has come up with?

15      So now we're talking about the plaintiff's

16  spreadsheets.

                        Page 10

---

2016 9.20 Schenkier_Youn_v_Sklar

17      MR. MEENAN:  Yes.

18      THE COURT:  Yes.

19      Have you analyzed those?

20      Yes.

21      Have you made any determinations of what's wrong with

22  them in your view?

23      It's very inaccurate.

24      Did you make notes?

25      I don't recall the notes being made, but we made

                                13

1  notes.

2      All right.  So that seems to me a little different

3  than what we talked about with the report, at least in terms

4  of the foundation for how much he had spent or engaged in

5  analyzing it.

6      You know, he says he analyzed those.  This isn't I

7  took a look.  I've got to accept people's words in terms of

8  the meaning I ascribe to them, okay?

9      So is it your view that they're not entitled to the

10  notebook?

11      MR. MEENAN:  It's my understanding, Judge, that what

12  Ms. O'Keefe has done --

13      THE COURT:  I'm not talking about Ms. O'Keefe.  I'm

14  talking about --

15      MR. MEENAN:  I don't believe there are notes, to

16  answer the question.

17      THE COURT:  So he was wrong when he said that.

18      MR. MEENAN:  Yes.  Dr. Sklar works very closely with

19  Melissa O'Keefe who frankly does the legwork.  She reports to

20  him.

                        Page 11

---

2016 9.20 Schenkier_Youn_v_Sklar

21      My understanding of what has occurred is, there has

22  been some selective testing of particular entries on the

23  spreadsheets to determine whether they're accurate or

24  inaccurate.  There is nothing that has been created separate

25  from them.

                                  14

1      THE COURT:  Is there -- have you produced any

2  documents regarding this selective testing?

3      MR. MEENAN:  No.

4      THE COURT:  Are there any?

5      MR. MEENAN:  There are the records themselves.

6  They're the underlying patient records themselves which have

7  all been made available to the plaintiffs.

8      THE COURT:  But do they know which particular items

9  on the spreadsheet were selected for this selected review?

10      MR. MEENAN:  No.

11      THE COURT:  Okay.  Did Ms. O'Keefe testify as to

12  that?

13      MR. MEENAN:  I don't recall off the top of my head.

14      THE COURT:  Well, I think they're entitled to know.

15  I mean, to say to them we gave them all the records and then

16  they did an analysis of the records and then you have

17  Dr. Sklar saying there's a lot of inaccuracies there, and

18  you're telling me that was based on them doing some kind of

19  selected audit, but then they don't know what they selected to

20  audit so they can't go back and really in fairness analyze

21  what the criticisms are.

22      MR. MEENAN:  Here's -- here's the problem, Judge.

23      THE COURT:  I think I've just articulated the

24  problem.

25      MR. MEENAN:  Well, yes, you have, and here's our

                        Page 12

2016 9.20 Schenkier_Youn_v_Sklar

15

1    problem.  They've given us spreadsheets with 9,000 different

2    patient entries in them.  What Ms. O'Keefe has done, and if

3    Your Honor says that we figure out how to get it to them,

4    we'll figure out how to do that, but what she did is she would

5    selectively go in the four categories and just randomly pick

6    line item entries and check the underlying records, which they

7    have, against the information that's in these spreadsheets to

8    determine the accuracy or inaccuracy and has, on many

9    occasions, determined inaccuracies.

10        I don't know physically how we would put that

11   together other than referring them back to the records that

12   they already have.  There may be a way to do that.  I'll have

13   to look into that if that's what Your Honor tells us we should

14   be doing.

15        THE COURT:  So do they know what, they being

16   Ms. O'Keefe or Dr. Sklar, what records they looked at in doing

17   this selected --

18        MR. MEENAN:  Yes.  It's the underlying patient

19   records.

20        THE COURT:  I mean, which of the particular 9,000

21   records.

22        MR. MEENAN:  Yes, I'm sure that they have.

23        THE COURT:  All right.  Well, then it's not hard,

24   okay?

25        If they didn't do any kind of report or do something

16

1    in some kind of systematic way in terms of recording it, but

2    still if they know what entries they looked at, they know what

Page 13

---

2016 9.20 Schenkier_Youn_v_Sklar

8    find the file tag that will come up with that record, and so

9    it's been extremely difficult to query and summarize those

10   records in a very succinct manner.

11        THE COURT:  Well, I'm not sure if that's being

12   offered as an explanation for why there may be inaccuracies;

13   but whatever the case is in some fashion, the defense is going

14   to provide the information about what entries were examined,

15   which ones were found to have inaccuracies, what those

16   inaccuracies are, what documents you examined in order to say

17   this is inaccurate so that, you know, people are operating,

18   you know, on the same base.

19        MR. MEENAN:  One of the -- I understand what you're

20   saying, Judge.  One of the --

21        THE COURT:  I hope so.  I thought that was about as

22   clear as I could do it.

23        MR. MEENAN:  It is.  This is something else.  It's

24   not arguing with what you said.  This is a rolling process as

25   well because it's incredibly time intensive to go through

18

1    9,000 line items.  The initial efforts were to sample.

2        THE COURT:  Yeah, but I know -- but understand this,

3    a couple things.  One is now the shoe is on the other foot.

4        Ms. Potter wanted to sample.  You said no, no, no, we

5    can't do a sample, we can't extrapolate from the sample, and

6    I'm sympathetic to that obviously because I said, you know,

7    I'm not going to allow just a sample, or at least I'm not

8    going to bless it.  You know, it was kind of caveat emptor.

9    You know, you want a sample, you do it at your risk so they

10   decided we'll plow through.

11        So now you've got a lot of stuff to look at.  That's

Page 15

---

2016 9.20 Schenkier_Youn_v_Sklar

3    their criticisms were.  I mean, I can see a couple ways of

4    doing that.

5        If they have something where they've actually

6    recorded it on paper, you can produce that.  If they haven't

7    done that, I can give the plaintiff leave to serve an

8    interrogatory that says, okay, for every item you have

9    analyzed and you've criticized as being inaccurate, identify

10   it, tell me what is inaccurate about it and identify by Bates

11   number the documents that you relied on.  I can do that.

12        MR. MEENAN:  I think I'd rather try the former first,

13   but the fact is this analysis, to the extent that it's been

14   conducted, has not been intended to exhaust these 9,000

15   different entries.  That would take forever, and that's one of

16   the --

17        THE COURT:  Well, and that's on your side.  I mean,

18   you're entitled to accept, you know, the accuracy of what

19   they've done.  You're entitled to say we've checked X number.

20   We find that there's such a high level of inaccuracy, we think

21   the whole thing is tainted.  You can do that.  You can take

22   that position, or you can go through every one.

23        That's not for me to tell you, but all I'm saying is

24   that whatever analysis you do, you know, which you are then

25   going to want to offer, you've got to give it to them.

17

1        MR. KLEIN:  Your Honor, may I just add something

2    here?  One of the difficulties in creating these spreadsheets

3    is we can't see the electronic record in the same way

4    defendants can see the electronic record.  This goes back to

5    the proprietary database issues that we had going to India.

6    So when they say look up John Smith's record, we're

7    essentially doing a search on a Windows Explorer trying to

Page 14

---

2016 9.20 Schenkier_Youn_v_Sklar

12   why I say it's really on the defense to choose how you do

13   that, and if you're saying it's too much to look through

14   9,000, I'm not requiring you to look through 9,000.

15        MR. KLEIN:  That is --

16        THE COURT:  But all I'm requiring is that whatever it

17   is you do in order to analyze or criticize the spreadsheets,

18   you've got to give that information up.

19        MR. MEENAN:  My point is it may be a rolling process.

20   It's not -- we can give them what we've done to date.

21        THE COURT:  You think you're going to do more?

22        MR. MEENAN:  Right, the other -- I hate to get too

23   far ahead of things, Judge, but there's another issue in this

24   case that if we had a better handle on it, I think it would

25   help tremendously to resolve problems like this.

19

1        There are kind of two levels as we understand it to

2    the plaintiff's claims in these four categories of treatment.

3    One is an overriding, all-inclusive, not-medically-necessary

4    theory, and that seems to us to be something that is either

5    going to be proved or disproven globally, if you will, on that

6    issue.

7        Then you drop down to another issue which is not

8    clear from these spreadsheets and that is whether there are

9    other particular -- particular allegations of fraudulent

10   submissions or such, in other words, upcoding, no records,

11   treatment wasn't actually performed.  That's a completely

12   different notion than this medical necessity issue, which is

13   overriding.

14        So we've kind of struggled with perhaps how to sort

15   that out because it would make, for instance, this analysis of

16   a spreadsheet a lot more understandable, I think, on both

Page 16

2016 9.20 Schenkier_Youn_v_Sklar

17  sides of the case.

18          We really haven't gotten any -- the spreadsheets
19  don't give that detail.  They don't say this one's fraudulent
20  because it wasn't medically necessary, as opposed to this one
21  that's fraudulent because the services weren't rendered or it
22  was upcoded or something to that effect.  It isn't in the
23  spreadsheets.

24          THE COURT:  This is the first time I'm hearing about
25  this.

                                                              20

1          MR. MEENAN:  And it's going to be an issue in this
2  case.  You've got two --
3          THE COURT:  Let me ask you this, because non-retained
4  expert discovery as we sit here right this moment, and we've
5  been dealing with this at various levels for two-and-a-half
6  years.  My first entry in this case is February of '14.  And I
7  understand there have been all manner of complexities for a
8  whole host of reasons, but when you come to me now
9  two-and-a-half years later saying I really don't understand
10  what their theory is, I've got to tell you that I'm not really
11  sympathetic.
12          MR. MEENAN:  I get their theory, Judge.  It's that
13  there are two different ones that these spreadsheets -- the
14  expert reports are there.  We both exchanged those reports and
15  the experts have their opinions on this medical necessity
16  issue.
17          My point on this analysis of these spreadsheets is
18  the spreadsheets don't differentiate between what we see as
19  the overriding theory and the perhaps more particular theory.
20  It's not that we don't understand it.

                        Page 17

2016 9.20 Schenkier_Youn_v_Sklar

21          THE COURT:  Did you raise -- did you raise that with
22  Ms. Potter during discovery?  Did you say, gee, I got these
23  spreadsheets, and it's ambiguous to me whether you're saying
24  that this particular one is upcoding versus not necessary or
25  maybe both, right?  You could upcode something and it wasn't

                                                              21

1  necessary in any event.
2          I'm not saying that happened, but, you know,
3  theoretically.
4          So I'm -- have you had that conversation?
5          MR. MEENAN:  The interrogatories posed that query,
6  Judge.
7          THE COURT:  Have you had that --
8          MR. MEENAN:  No, we have not had a conversation to
9  that effect.
10          THE COURT:  Have you ever raised with her since they
11  provided the spreadsheets that the spreadsheets were
12  inadequate because they did not fairly meet the interrogatory
13  question?
14          MR. MEENAN:  No.
15          THE COURT:  Okay.  There's very little for me to do
16  about it, as I see it, unless you're saying, gee, we need to
17  reopen discovery.
18          MR. MEENAN:  No, I didn't ask for that.  We've met
19  all of our deadlines, and we're prepared to continue --
20          THE COURT:  I'm going to pass the case for a few
21  minutes because I have a couple other matters to take up, so
22  don't go too far.
23          (Case passed at 9:54 and resumed at 10:16 a.m.)
24          THE CLERK:  Case No. 10 C 5583.
25          THE COURT:  Why don't you go get your counterparts.

                        Page 18

2016 9.20 Schenkier_Youn_v_Sklar

                                                              22

1  Thanks.
2          (Pause.)
3          THE CLERK:  Says No. 10 C 5583, Youn versus Sklar,
4  motion hearing.
5          THE COURT:  Welcome back.  Same cast of characters?
6  Okay.  Very good.
7          Well, we have, I guess, three things.  We have the
8  question of Dr. Sklar's review of the expert report.  We have
9  I guess it's the wart study?
10          MR. MEENAN:  Yes.
11          THE COURT:  Okay.  And we have the examination that
12  has been done by Dr. Sklar and Ms. O'Keefe -- and/or -- with
13  respect to the spreadsheets.
14          In looking at the deposition and based on our
15  discussion, I think that there's information about those
16  things that the plaintiff is entitled to have and we have to
17  come up with the best way to do things, and as I've said, this
18  does not require anybody to do an analysis that they otherwise
19  weren't going to do.
20          So in other words, if Dr. Sklar did a quick-and-easy,
21  glide-over, 38-page review of the expert report, he's not
22  required then to go and study as if he were cramming for a
23  final over the 38 pages, but whatever level of review he did,
24  he is allowed to be questioned about that.  And he made
25  certain comments, and they're allowed to explore those

                                                              23

1  comments and any other observations based on his review that
2  he has of the report.
                        Page 19

2016 9.20 Schenkier_Youn_v_Sklar

3          The wart study -- now, tell me the form of that?
4          MR. MEENAN:  My understanding, Judge -- I hear what
5  you're saying.  I'll go back and check with Ms. O'Keefe.  I
6  understand what she did is she simply went in and added up the
7  number of wart treatments during a period of time and the
8  number of separate treatments and divided and came up with an
9  average of 4.4.  I don't even know whether that was reduced to
10  notes or writing.  If it was, I will -- I understand you're
11  saying make it available, and we will do that.
12          THE COURT:  Okay.
13          MR. MEENAN:  If it's not anything that was done other
14  than mentally, I'll convey that information to the plaintiff.
15          THE COURT:  And then with respect to the
16  spreadsheets, again, you know, Dr. Sklar testified that there
17  are notes, and whether there are or are not, he certainly
18  testified that there was, you know, a review that was beyond
19  let me just pass eyes on it.  In fact, you described it.
20          Now, it wasn't of every entry on the spreadsheet, but
21  it's selected.  And they are entitled to know which entries,
22  if I'm using the right vernacular, which entries he reviewed
23  or Ms. O'Keefe reviewed at his direction, what criticism they
24  have, the basis for those, and the documents that they say
25  underlie that criticism that shows there's something wrong.

                                                              24

1  They're entitled to have that underlying information, and
2  they're entitled to have the testimony.
3          So I can envision that happening in a couple ways.  I
4  can envision, as I say, an interrogatory.  Identify every
5  entry on the spreadsheet that you have reviewed and which you
6  have criticism about and what is the criticism and what are
7  the documents that support that.  You can do it that way.
                        Page 20

2016 9.20 Schenkier_Youn_v_Sklar

8          And if they haven't done any kind of systematic
9     report, maybe that's going to be the most effective way.
10          MR. MEENAN:  My understanding is that there's no
11    report, as you say.
12          THE COURT:  All right.
13          MR. MEENAN:  That there was a blind -- I don't even
14    know how the selections were made, but there were random
15    selections of line item entries, and that was the nature of
16    the analysis.
17          THE COURT:  All right.
18          MR. MEENAN:  I -- that was Ms. O'Keefe though, not
19    Dr. Sklar.  As I said before, she's the one that does the
20    legwork, if you will, so if we're going to talk about
21    Dr. Sklar appearing for the conclusion of his deposition, I
22    frankly doubt that he's the one to ask about those selected
23    analyses of the spreadsheets.
24          THE COURT:  Well --
25          MR. MEENAN:  He did say there was an analysis done.

25

1     I don't know that he said he did it.
2          THE COURT:  Have you looked at the spreadsheets?
3          Yes.
4          Have you analyzed those?
5          Yes.
6          Have you made any determination of what's wrong with
7     them in your view?
8          It's very, very inaccurate.
9          I take that as a yes.
10          Okay.  Did you make any notes?
11          I don't recall the notes being made, but we did make
          Page 21

2016 9.20 Schenkier_Youn_v_Sklar

12    notes.
13          Now, that becomes a little more vague, did he make
14    the notes, did Ms. O'Keefe make the notes: but it certainly
15    implies that whether he made them, he looked at them.  And so
16    I don't see why he wouldn't be the one to testify about that.
17          Certainly Ms. O'Keefe can testify if she prepared
18    notes, but if Dr. Sklar looked at them, you know, they are
19    entitled to have his take on it.  He is the defendant.
20          MR. MEENAN:  I wasn't suggesting that they weren't.
21          THE COURT:  Yeah.
22          MR. MEENAN:  I was just saying --
23          THE COURT:  I understand.
24          MR. MEENAN:  -- that Ms. O'Keefe's the one who did
25    it.

26

1          THE COURT:  Okay.  So with respect to this particular
2     issue, I guess what I -- what I have in mind, and maybe this
3     will help focus things, I'm going to allow the plaintiff to
4     serve an interrogatory asking the questions I identified about
5     the spreadsheets, including any documents created or reviewed
6     identifying those, that reflect the analysis or that show why
7     they think there are errors, okay?
8          If in the end you think there is some report that
9     provides that information, then, you know, you could do that
10    as a Rule 33(d) response; but absent that, we've got something
11    in place that provides a vehicle to get that information.
12          I guess I would allow an interrogatory with respect
13    to the wart study.  Same thing.  What I am going to allow is
14    that Dr. Sklar and Ms. O'Keefe be produced for further
15    examination limited to those two things, and with respect to
16    Dr. Sklar, it would also include any criticisms or opinions he
          Page 22

2016 9.20 Schenkier_Youn_v_Sklar

17    has concerning the expert report that he says he looked at and
18    that he did say he had criticism of, okay?
19          Now, those will be, I think, fairly limited
20    depositions, okay?  But rather than talk about when those are
21    or what the time is, I think I'd like to see what the
22    responses are to the information I'm talking about because
23    that will help give us guidance as to what's an appropriate
24    time.
25          But one of the reasons I want to have this written

27

1     response is I think it makes it easier to do the deposition,
2     as opposed to it being kind of free form and a memory test,
3     okay?
4          MR. MEENAN:  Yes.
5          THE COURT:  All right.
6          MR. MEENAN:  As soon as we get the interrogatories,
7     we'll do our best to put the responses together.
8          THE COURT:  All right.
9          MS. POTTER:  We have one draft -- we can serve it
10    tomorrow.
11          THE COURT:  But I'm authorizing you to ask the
12    questions that I identified.
13          MS. POTTER:  Yes.
14          MR. MEENAN:  Right.
15          THE COURT:  It's not kind of a --
16          MR. PLATT:  We'll have to redraft.
17          THE COURT:  You'll probably be more extravagant than
18    I was.
19          MR. MEENAN:  Two interrogatories, as I understand it?
20          THE COURT:  Yes.
          Page 23

2016 9.20 Schenkier_Youn_v_Sklar

21          All right.  Let me jump for a moment --
22          MS. POTTER:  Your Honor, can I ask one clarifying
23    point?  Are we allowed to issue an interrogatory on Warshaw's
24    report?  Because during the break --
25          THE COURT:  I haven't -- I'm not done.

28

1          MS. POTTER:  Okay.  Just to clarify, I did go back to
2     Exhibit 1 to the motion, the 26(a)(2)(C)s, he was designated,
3     Dr. Sklar and Dr. Ruckman both, commencing on Page 5 of 8 of
4     the disclosure through 6 and to 7.  All the matters they said
5     those two doctors would testify to were the matters in dispute
6     in Dr. Warshaw's report, such as CMS criteria, that the
7     defendants have complied with all the contractual performance,
8     those are rebuttals to Dr. Warshaw's report, the substance of
9     the report.
10          THE COURT:  Anything else?
11          MS. POTTER:  No.  Thank you.
12          THE COURT:  Okay.  Since you raised Dr. -- how is it
13    pronounced?
14          MR. PLATT:  Warshaw.
15          THE COURT:  Warshaw?  Okay.  You want to serve an
16    interrogatory?
17          MS. POTTER:  May we, please?
18          THE COURT:  But interrogatories are served on
19    parties.
20          MS. POTTER:  No, we want to serve it on the defendant
21    of their critique of Dr. Warshaw's report, as stated they
22    would do in the 26(a)(2)(C)s, which he was instructed not to
23    answer in his dep, or we can do it in his dep, so all the
24    matters they've designated like in the 30(b)(6) --
25          MR. PLATT:  Yeah, Warshaw is our expert, as opposed
          Page 24

2016 9.20 Schenkier_Youn_v_Sklar

29

```
1    to Dr. Warheit who's somebody else.
2           THE COURT:  Okay.
3           MS. POTTER:  Sorry.
4           THE COURT:  He's a former business --
5           MR. PLATT:  Right.  There's too many Ws.
6           THE COURT:  All right.
7           MR. MEENAN:  The non-retained expert disclosures in
8    the answers to interrogatories have nothing to do with
9    Dr. Warshaw's report.  They were independent of anything that
10   Dr. Warshaw had to say.  We think they may have been prepared
11   before we even had the report.
12          MS. POTTER:  Actually that's not accurate.
13          THE COURT:  I guess I didn't see that in your motion.
14          MS. POTTER:  It might not have been clear enough.
15          THE COURT:  If it's not clear enough, I'm not doing
16   it.
17          MS. POTTER:  Okay.
18          THE COURT:  Okay.  Let's go to the spoliation issue.
19   I mean, one of the problems in this case is we keep kind of
20   jumping around.
21          MR. MEENAN:  Right.
22          THE COURT:  And you have -- you said I want some
23   discovery.  You've had a very complete and very full motion.
24   I obviously took the time to look at it closely.  I'm not
25   going backwards.
```

30

```
1           On the spoliation issue, it was unclear to me exactly
2    what the plaintiff wants.  Let me go back just to set the
```

2016 9.20 Schenkier_Youn_v_Sklar

```
8    name?
9           MR. MEENAN:  He had them, for instance, bunions,
10   2015, bunions, patients, 2015.
11          THE COURT:  So I guess one of the criticisms, because
12   the plaintiffs acknowledge -- plaintiff acknowledged that he
13   did on August 1st produce pictures, but they say it shows a
14   bunch of feet, and it doesn't allow you to correlate them to a
15   particular patient.
16          Are they incorrect about that?
17          MR. MEENAN:  No.  My -- that's my understanding of
18   what's on his phone.
19          THE COURT:  But when the doctor -- so can the doctor
20   correlate them to a patient?
21          MR. MEENAN:  Can I -- can I suggest that maybe we add
22   this to the topics to be pursued at his next session?  Because
23   I think he's the one to best answer.
24          I don't know, Judge.  What I did is I asked about
25   everything there is.  I said copy everything there is, and I
```

32

```
1    gave everything I was told there is to Ms. Potter.
2           THE COURT:  So when he opens a phone and he looks at
3    a picture if it's a file bunions of 2015, how many bunion
4    patients, give me a ballpark, would he treat in 2015?
5           MR. MEENAN:  There's a lot of surgeries.  He has a
6    specialty in this --
7           THE COURT:  Give me a ballpark.
8           MR. MEENAN:  I don't have one, Judge.  I really don't
9    want to guess.  A lot.
10          THE COURT:  More than a hundred?
11          MR. MEENAN:  I would say probably yes.
```

2016 9.20 Schenkier_Youn_v_Sklar

```
3    scene.  It says in the motion that there are records that
4    exist that were not previously disclosed prior to Dr. Sklar's
5    deposition, one of them being photographs on phones back to
6    2001.
7           I have to say when I read his deposition, he didn't
8    say that he had them on his phone back to 2001.  He said he
9    loves pictures.  That I saw.  And that he had been taking them
10   for 15 years, but it wasn't clear to me in the testimony that
11   said that he preserved them for 15 years.
12          MR. MEENAN:  If I can tell Your Honor something, and
13   I don't mean to interrupt, what we did after this came up --
14   and we did communicate at length about this -- I sent a
15   lengthy e-mail to Ms. Potter on July 15th after I had an
16   opportunity -- because we hadn't heard about these photos on
17   the phones ourselves.  There are photos in the EMR that have
18   been produced with all of the other material that had been
19   produced.  Dr. Sklar, who likes to talk, brought out his
20   phone --
21          THE COURT:  Maybe not as much to his attorneys as he
22   should.
23          MR. MEENAN:  -- at the deposition and said he has
24   before-and-after -- before-and-after photos on his phone.  I
25   looked into it.
```

31

```
1           On August 1st, we sent to Ms. Potter every single
2    photograph that was on his phone.
3           THE COURT:  Can I ask how many?
4           MR. MEENAN:  There were a lot.  I have them by file
5    names.  There are two pages of file names.  There are a lot of
6    photographs.
7           THE COURT:  When you say file name, what's the file
```

```
12          THE COURT:  So as the proud owner of some nasty
13   bunions, maybe they're all so unique that he can look and say,
14   oh, that was Jim or that was Jane.  But if he -- if he can't
15   simply remember the patient by looking at the picture, you
16   might want to ask him is there something in the phone that
17   allows you to know that this was Jim?  Because if there is,
18   plaintiff gets to have it, okay?
19          MR. PLATT:  I believe he said that in his deposition.
20   He said that he keeps it on the phone so when people call, he
21   knows what --
22          THE COURT:  Yeah.
23          MR. PLATT:  Yeah, yeah, I understand.
24          MR. MEENAN:  He said a lot of things in his
25   deposition.
```

33

```
1           THE COURT:  Well, I get that but, you know, sometimes
2    we -- what we say has consequences.
3           MR. MEENAN:  I will get any more information that I
4    can on that, and I also have no problem -- I will get it to
5    them sooner than later, but I also have no problem if they
6    want to explore that more --
7           THE COURT:  Yeah.
8           MR. MEENAN:  -- at the next session of the deposition
9    also.
10          THE COURT:  And I think that that's fair, but, again,
11   if there's a way of identifying information, I think what it
12   allows -- and that helps everybody because it allows them to
13   say here's some that I want to pursue in particular, as
14   opposed to just kind of roaming around --
15          MR. MEENAN:  I'll find out.
16          THE COURT:  -- because then you guys will argue with
```

2016 9.20 Schenkier_Youn_v_Sklar

17  each other, and that won't be good.
18       MS. POTTER:  What we didn't know, Your Honor, is he
19  testified he had the full package with Apple and he backed up
20  to an iCloud, and we understood that the iCloud designated a
21  date --
22       THE COURT:  Ms. Potter, Ms. Potter, I just ruled in
23  your favor.
24       MS. POTTER:  Okay.
25       THE COURT:  Will you make it better?

34

1       MS. POTTER:  No.  That's fine.  Thank you.
2       THE COURT:  Okay.  Generally when you win, the best
3  thing to do, hold your piece.
4       MS. POTTER:  Thank you.
5       THE COURT:  I guess one other issue was patient
6  records on the laptop.  Now, this -- you said he testified to
7  this, although this is one of those areas where there wasn't
8  any citation to his deposition that you -- that I saw.
9       So let me ask you, does he have patient records on
10  the laptop that are not records that have been produced?  That
11  are records that haven't been produced?
12       MR. MEENAN:  The answer is no, and I followed up on
13  this again with Ms. O'Keefe who handles the iCloud
14  arrangements and everything else.
15       The only thing on the laptop are the same photos that
16  are on his phone.  They're shared via the cloud somehow.  The
17  information that I got, and I think I shared with Ms. Potter,
18  was there are no records on his laptop computer that relate to
19  patient records.  The patient records have all been divided in
20  a process that Your Honor has overseen and directed already.

Page 29

2016 9.20 Schenkier_Youn_v_Sklar

21       THE COURT:  Okay.
22       MR. PLATT:  I think that's probably fair.  He was
23  sharing it on the iCloud, and it was -- laptop was iCloud,
24  so --
25       THE COURT:  All right.

35

1       MS. POTTER:  Actually, just one point of
2  clarification.  During the break, he turned his computer
3  around to show us and the court reporter, and he said, look, I
4  have every record, and he had patient files by name that were
5  not photographs.  And we said on the record, and I'm looking
6  for the citation, Dan, we want you to produce what he has on
7  his laptop.  You already have all those records.
8       But it's not true, Your Honor.  We don't have any
9  records that were specifically designated as production from
10  Dr. Sklar's laptop.  I personally did see and the court
11  reporter did see Dr. Sklar turned it around and said, see, and
12  he had all these patients by name.  Those weren't photographs.
13       THE COURT:  I'm not at this point willing to go back
14  and require production in a different form of something that's
15  been produced, and if it's a patient file that has been
16  produced and he has another copy of it on his computer, I'm
17  not interested at this late date in going backwards.
18       I will set a deadline for any Rule 26(e)
19  supplementation.
20       MS. POTTER:  Thank you.
21       THE COURT:  Now, with respect to depositions, let me
22  work backwards.  The medical assistants and the patient PB, to
23  cut to the chase, that request is denied.  I understand that
24  we're at the end of the discovery, it's clear we're after the
25  discovery.  I think that, Ms. Potter, had you a sense that

Page 30

2016 9.20 Schenkier_Youn_v_Sklar

36

1  somehow the deadline was a blind side.  In fact, I did
2  misspeak, I think I said it was done on July 25th.  It was
3  actually done July 29th, and that was the date that I had set
4  I think back in March, at which point the parties told me they
5  had then 10 depositions.
6       You know, it wasn't, Judge, we're going to do four
7  key ones, and then we'll seek more time to do others.  So I'm
8  not -- I'm not going to allow those.
9       In terms of Mr. -- the other Mr. W.
10       MR. KRALOVEC:  Warheit.
11       THE COURT:  Warheit?  I guess I have the same
12  question.  Why wasn't he deposed earlier?  Why wasn't he
13  deposed earlier?
14       MS. POTTER:  I think perhaps maybe we misread your
15  March 9th order which didn't appear to us to set a fact
16  discovery cutoff, and so what we were doing was working
17  cooperatively to first finish the non-designated experts,
18  which then we cooperatively agreed would be fact witnesses as
19  well so we wouldn't have to duplicate, and then we would take
20  the remaining deps.
21       We needed to get these key people out, done first,
22  and it took a lot -- that's why I say we spent weeks and weeks
23  in the preparation.
24       THE COURT:  This particular deposition for what you
25  tell me you want it for would not be rocket science.  You

37

1  didn't need anybody else's deposition to know what was his
2  relationship with Dr. Sklar or Dr. Sklar's practice at the

Page 31

2016 9.20 Schenkier_Youn_v_Sklar

3  time that these documents were, you know, destroyed; you know,
4  what conversations did he have, if any, about that; what did
5  he know about this case.  You don't need spreadsheets.  You
6  could have deposed him at any time over the last two years.
7  You had the information you needed to do that, so the answer
8  is no.  There's no good cause.
9       So let me recap on the motion.  The motion is granted
10  in part and it's denied in part.  I am giving the plaintiff
11  leave to serve two interrogatories consistent with the
12  limitations that I described, focusing on the specific
13  that the plaintiffs provided in response to interrogatories
14  and to an internal wart study done by the defense.
15       You can serve those interrogatories we'll say by the
16  end of the week.  If you get it done earlier, that's fine,
17  but -- and then what we'll do is have the normal time period
18  for responding to them.
19       MR. MEENAN:  If I can do it sooner, I will.
20       THE COURT:  I understand.
21       MS. POTTER:  Your Honor, can I ask for a point of
22  clarification on patient PB?  We didn't take his dep --
23       THE COURT:  Can I finish my ruling?
24       MS. POTTER:  Oh, okay.
25       THE COURT:  And, again, it's, you know, it's really

38

1  not clarification.  I think that a ruling that says I'm
2  denying the motion is about as clear as it can be.
3       MS. POTTER:  Okay.
4       THE COURT:  It's like I grant the motion, clear as it
5  can be.  And I've always found that when people say, Judge,
6  can you clarify, they usually mean can you change something
7  you did?  That's what they usually mean.

Page 32

2016 9.20 Schenkier_Youn_v_Sklar

8      MR. MEENAN:  Motion to reconsider.

9      THE COURT:  So the interrogatories will be served by
10 the 23rd of September.  They'll be answered by the 24th of
11 October.

12     I will -- well, let me go further.  With respect to
13 the photographs, what I will order is that to the extent that
14 your defendant has a means of linking particular photographs
15 to particular patients, that that information be provided to
16 the plaintiff.  Can we do that in a shorter period of time?

17     MR. MEENAN:  Yes, I can get that information soon --

18     THE COURT:  Why don't we say in two weeks.

19     MR. MEENAN:  That's no problem.

20     THE COURT:  All right.  Be careful what you say.
21 Everything in this case is a problem.

22     So that's by October 4th, and at that time what I
23 want you to do is if you have the information, provide it.  If
24 you do not have the information, then say we don't have that
25 information, all right?

39

1      What I will also do is set a deadline for
2 supplementation of Rule 26 -- of your discovery under
3 Rule 26(e).  Would the parties feel comfortable with a
4 deadline of October 31st?

5      MR. MEENAN:  Yes.

6      MS. POTTER:  That's fine with us except insofar as
7 Your Honor's order of July 26th requires us to produce our
8 expert report by -- rebuttal by 10/13 and deps by 11/18.  We
9 can finish the deps by 11/18 and integrate all that new
10 information, but I don't know if we could have --

11     THE COURT:  Well, my expert schedule stands, but what

Page 33

2016 9.20 Schenkier_Youn_v_Sklar

12 I'm saying is that supplementation of your prior fact
13 discovery shouldn't depend on the experts.

14     MR. MEENAN:  The only thing that comes to mind,
15 Judge, is the incredible difficulties we had with the Meditab
16 queries and everything else.

17     Now, there obviously is more EMR in their database,
18 but I don't have any way to typically supplement with things
19 that post-date your last orders on the cooperation with their
20 technology person and on the queries to Meditab and all that.
21 There's no way to get them that.

22     THE COURT:  Okay.

23     MS. POTTER:  For me, Judge, I don't know what that
24 means, if they're going to rely on it --

25     MR. MEENAN:  We're not going to rely on it.  There

40

1 are 9,000-plus false claims right now.  If they prevail on
2 9,000 claims, I don't know what difference the interim period
3 of time is going to make to the case.  I'm just saying I don't
4 know how I get it.

5      THE COURT:  Rule 26(e) supplementation covers a
6 couple things.  It covers your prior discovery responses, but
7 it also covers your prior Rule 26(a)(1) disclosures.  And
8 maybe the plaintiff is more interested in the latter because
9 the 26(a)(1) disclosures are one of the things you may use.

10     Is that what you're more interested in?

11     MR. PLATT:  Yes.

12     THE COURT:  Okay.  Then we'll set a deadline for
13 supplementing initial disclosures of October 31st.

14     MR. MEENAN:  Okay.

15     THE COURT:  All right.  As I say, I've denied the
16 initial -- the additional depositions that were sought of the

Page 34

2016 9.20 Schenkier_Youn_v_Sklar

17 medical assistants, the patient and Warholt.

18     I will allow reconvened depositions of Dr. Sklar and
19 of Ms. O'Keefe.  We'll defer at this time when those
20 depositions will take place or the amount of time that will be
21 allocated for the depositions, pending some of the production
22 of these other materials.

23     So what I'd like to do, given some of these
24 deadlines, is to set a status.  How about November 9th at
25 9:00 a.m.  Okay?

41

1      All right.  Anything --

2      MR. MEENAN:  Thank you for your time, Judge.

3      THE COURT:  No worries.  Anything further today?

4      MR. MEENAN:  No, thanks.

5      MS. POTTER:  Thank you, Judge --

6      THE COURT:  Thanks a lot.

7      MS. POTTER:  -- for all the time, patience.

8      THE COURT:  At least part of that.

9      MS. POTTER:  Part of it.  All of it.  Thank you.

10     THE COURT:  Okay.

11     (Which were all the proceedings heard.)

12                    CERTIFICATE

13     I certify that the foregoing is a correct transcript from
14 the digital recording of proceedings in the above-entitled
15 matter to the best of my ability, given the limitations of
16 using a digital-recording system.

17

18 /s/Kathleen M. Fennell          September 27, 2016

19

Kathleen M. Fennell              Date
20 Official Court Reporter

Page 35

2016 9.20 Schenkier_Youn_v_Sklar

21

22

23

24

25

Page 36