# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES of AMERICA and the STATE OF ILLINOIS *ex rel.,* JAMES YOUN, M.D. | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 10 CV 5583 |
| v. | ) ) | |
| KEITH D. SKLAR, individually and FOOT FIRST PODIATRY, and their successors and assigns, *et. al.* | ) ) ) ) | Magistrate Judge Sidney I. Schenkier |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff-relator James Youn ("relator" or "Dr. Youn") brought this action against podiatrist Keith D. Sklar and his podiatric practice, Foot First Podiatry ("defendants" or "Dr. Sklar"), pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et. seq.* and the Illinois Insurance Claims Fraud Protection Act ("IICFPA"), 740 ILCS 92/1, *et. seq.* (doc. # 100: Fourth Amended Complaint ("4th Am. Compl."). The United States declined to intervene on November 4, 2013 and the complaint was unsealed (doc. # 16); the State of Illinois declined to intervene on November 8, 2013 (doc. # 20).

Count I of the complaint alleges that defendants submitted false claims for reimbursement to Medicare and Tricare[2] for four types of podiatric treatments: Doppler,

---

[1] On February 12, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 85).

[2] Tricare is the government-funded health care program for uniformed service members and their families. https://www.tricare.mil/About (visited on June 5, 2017). In this opinion, we refer to Medicare and Tricare collectively as "Medicare."

ultrasound, wart removal with acid, and neurolysis, (which is the injection of a sclerosing agent into patients' heels) because those treatments were not "medically reasonable and necessary" under Medicare rules for reimbursement (4th Am. Compl. ¶¶ 65, 75, 89, 96, 109, 135-144). Count II alleges that defendants have violated the IICFPA by submitting false claims for reimbursement to private insurance companies for treatments that were not medically necessary (and thus fraudulent) (4th Am. Compl. ¶¶ 145–150). Count III alleges that defendants have committed spoliation of evidence by shredding relevant medical records (4th Am. Compl. ¶¶ 151-156).

After the close of discovery and the exchange of expert reports, Dr. Youn filed a motion for summary judgment on Count I of the 4th Am. Cmplt. (doc. # 193) and defendants filed a motion for summary judgment on Counts II and III of the 4th Am. Compl. (doc. # 191); these motions are now fully briefed (doc. ## 200, 204, 212, 216). In response to relator's motion for summary judgment, defendants argue that all of the challenged treatments were medically necessary and in compliance with all applicable Medicare regulations. Dr. Sklar also contends that relator's documentary evidence of the number and cost of allegedly false claims submitted to Medicare is unreliable and erroneous (doc. # 200: Summ. J. Resp. at 6, 9, 11, 13). With respect to Count II, defendants argue that by its terms, the ILCFPA does not apply to the allegations at issue; relator contends that defendants' statutory interpretation is erroneous and, moreover, that defendants' submissions to private insurers are false because the underlying treatments were not medically necessary (Relator's Resp. to Mot. for Summ. J. at 9). Count III alleges that defendants have committed spoliation of evidence by destroying allegedly relevant medical records. For the following reasons, we deny relator's motion for summary judgment on Count I and grant defendants' motion for summary judgment on Counts II and III.

# I.

The legal standards governing motions for summary judgment are well-established. Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the movant shows that there is an absence of evidence to support the nonmoving party's case, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013) (internal citations and quotations omitted).

In deciding a motion for summary judgment, we "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen'l Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). We do not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). That said, we are mindful that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

To assist us in deciding his motion for summary judgment, and as required by Fed. R. Civ. P. 56 and Local Rule 56.1, each side has submitted a statement of material undisputed fact in support of their respective motions (doc. # 192: Defendants' Statement of Fact ("DSOF"),

3

doc. # 196; Relator's Statement of Fact ("RSOF"). Defendant responded to relator's statement (doc. # 201: Resp. to RSOF) and also filed additional statements of undisputed fact in opposition to relator's motion (doc. # 201: "Def. ASOF"), to which relator has not responded.[3] However, relator has responded to defendants' Rule 56.1 statement filed in support of their motion for summary judgment on counts II and III of the 4th Am. Cmplt. (doc. # 205: "Resp. to DSOF"), and has also filed a statement of additional facts (doc. # 205: "RSOAF"), to which defendants have responded (doc. # 213: "Resp. to RSOAF"). We use these statements to describe the facts in this case, noting where relevant whether a particular fact is in dispute.

## II.

We begin with consideration of Count I, which asserts a claim under the FCA. The purpose of the False Claims Act is to give the government a vehicle "for recouping losses suffered through fraud." *U.S. v. Sanford-Brown, Ltd.,* 788 F.3d 696, 700 (7th Cir. 2015), *abrogated on other grounds by Universal Health Serves, Inc. v. U.S.*, 579 U.S. __. 136 S.Ct. 1989 (2016). The Attorney General of the United States may bring a lawsuit directly in the name of the United States, 31 U.S.C. § 3730(a); or, as here, a private individual, called a relator, may bring an action in the name of the government if the government elects not to sue. 31 U.S.C. § 3730(b).

---

[3] While a party's failure to respond to a statement of undisputed fact could result in having those facts deemed admitted, LR 56.1(a)(1)(B), in this situation, we decline to do so. Defendants' statements of additional fact often consist of rambling conclusions about the ultimate issues to be decided in this case, and not facts which can be readily determined to be disputed or not. We cite one example: "Sklar has presented objective facts and testimony, rationally explaining and offering admissible evidence supporting his position that his provision of an billing Medicar or Tricare for reasonable and necessary services involving challenged, but patient specific wart treatments were appropriate and in accord with applicable Medicare, Tricare requirements" (SOAF ¶ 8). This kind of assertion is not a statement of fact that complies with L.R. 56.1. *See, De v. City of Chicago,* 912 F.Supp.2d 709, 713 (N.D. Ill. 2012) (LR 56.1 statements of fact should not include conclusory allegations or vague, argumentative, or immaterial assertions).

In this case, relator alleges that defendants have violated two sections of the FCA: (a) 31 U.S.C. § 3729(a)(1)(A), which imposes liability on any person or entity who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" ("presentment claims") and (b) 31 U.S.C. § 3729(a)(1)(B), which imposes liability on any person or entity that "knowingly makes, uses, or causes to be make or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government" ("false statement claims") (Complt. ¶¶137, 138). *See also, U.S. ex rel. Grenadyor v. Ukranian Village Pharmacy, Inc.*, 772 F.3d 1102, 1105 (7th Cir. 2014).

To establish an FCA violation under Section 3729(a)(1)(A), a relator must show that: (1) defendants presented a claim to receive money from the government; (2) the claim was false; (3) defendants knew that the claim was false; and (4) the false claim was material to the government's decision to pay or approve the false claim. *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 561 (7th Cir. 2015). An FCA violation under Section 3729(a)(1)(B) requires a relator to show that: (1) a statement was made by defendants to receive payment from the government; (2) the statement was false; (3) defendants knew it was false; and (4) the false statement was material to the government's decision to pay or approve the false claim. *Id.* A statement is "material" if it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Section 3729(b)(4). The "knowledge" element of a Section 3729 claim requires proof of "actual knowledge, deliberate ignorance, or reckless disregard for the truth; knowledge does not require specific intent to defraud." *See, Marshall v. Woodward, Inc.,* 812 F.3d 556, 561 (7th Cir. 2015).

Relator's motion does not specifically identify any allegedly false statements in violation of Section 3729(a)(1)(B) that defendants made to induce the government to pay. We decline to

cull through the documents and exhibits submitted to try to find false statements the relator has failed to identify; "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991). Therefore, we deny plaintiff's summary judgment motion insofar as it is based on alleged violation of Section 3729(a)(1)(B). We turn to relator's Section 3729(a)(1)(A) claim, which requires more extended analysis.

## A.

The gist of relator's Section 3729(a)(1)(A) claim is that defendants submitted claims for treatments that were false because defendants knew they were not reimbursable pursuant to Medicare guidelines known as "local coverage determinations," or "LCDs." Generally, Medicare will only reimburse for medical treatment that it deems "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). Deciding when any individual medical treatment is "reasonable and necessary" is delegated in the first instance to the Department of Health and Human Services ("HHS"), which may decide whether to exclude certain types of treatments nationwide by promulgating national coverage determinations ("NCDs"). 42 U.S.C. §§ 1395y, 1395ff.

HHS contracts with local insurance carriers – called Medicare administrative contractors, or "MACs" – to provide services in a particular locality. These MACs may then create the LCDs. *See* 42 C.F.R. § 400.202, *United States ex rel. Baer v. Ludden,* No. 13-cv-223, 2016 WL 1259432 (W.D. Wis. March 30, 2016). Specifically, "an LCD is a written policy decision by a MAC whether to cover a particular item or service on a MAC-wide basis in (*i.e.,* a determination as to whether the item or service is reasonable and necessary)" (Resp. to Mot. for S.J., Exh. 1/8 at 4). LCDs set regional coverage determinations that govern in the absence of a national policy about whether a particular treatment or procedure is reimbursable. *United States v. Prabhu,* 442 F.Supp.2d 1008, 1012 (D. Nev. 2006) (*citing* 68 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003)).

Relator contends that defendants violated Section 3729(a)(1)(A) by submitting reimbursement claims for procedures that were not reasonable and necessary under the LCDs that govern the four treatments at issue. Dr. Sklar admits that he is generally familiar with LCDs (Resp. to RSOF ¶¶ 10-12), but argues that LCDs are mere guidance – and not binding requirements – for doctors to use when rendering and claiming reimbursement for treatment (Resp. to Mot. for Summ. J. at 5). Furthermore, Dr. Sklar denies that he violated any of the requirements contained in the LCDs with respect to the treatment he provided his patients. Therefore, the first issue we must address is whether LCDs are binding and enforceable on doctors who submit claims to Medicare, and whether the submission of claims for reimbursement for treatment is not reasonable and necessary under an applicable LCD can create liability under the FCA.

The very limited case law on the question supports the proposition that submitting claims that are contrary to an LCD can – under certain circumstances – give rise to FCA liability for non-compliance. *See, e.g., U.S. ex rel. Ryan v. Lederman*, 04-cv-2483, 2014 WL 1910096 at *6 (E.D.N.Y. May 13, 2014), *U.S. Space Coast Medical Associates, LLP,* 94 F.Supp.3d 1250 (M.D. Fla, 2015). A recent case from this district also suggests that an LCD could be binding on a provider if it is not "retired," that is, was in effect when the claim for reimbursement was submitted, it covers the proper jurisdiction where the treatment occurs, and it covers the treatment or procedure rendered. *United States v. Nuwave Monitoring, LLC,* 12 C 69, 2016 WL 750155 at *4 (N.D. Ill. Jan. 26, 2016) (on motion to dismiss, relators failed to allege any rule or regulation that defendant allegedly violated, because LCD at issue was retired at the time of treatment).[4]

---

[4] *See also, United States ex rel. Baer v. Ludden,* 2016 WL 1259432 *at* * 2. The issue in *Ludden* was whether the MAC violated the FCA by falsely certifying to the government that it was taking proper steps to

In *Lederman,* the court found that a "straightforward reading of the text" of the relevant LCD confirmed that Medicare would not cover a procedure called stereotactic radiotherapy if it was performed on parts of the body below the neck, and there was no dispute that defendant did in fact seek payment from the government for these procedures performed below the neck. 2014 WL 1910096 at *3. The court held that the LCD represented a rule implemented by a local contractor in the absence of an NCD, and that the LCD was conclusive on the matters it addressed. *Id.* at *4. By seeking reimbursement for a treatment that was categorically not covered by Medicare, defendant in that case submitted a false claim under the FCA. *Id.* at *3.

Like the defendant in *Lederman,* the defendants here argue that LCDs are mere guidance, and thus failure to adhere to them, without more, cannot give rise to an FCA claim. In support of their position, defendants point to the Medicare Program Integrity Manual,[5] which states that LCDs are "administrative and educational tools to assist providers in submitting correct claims for payment" (Resp. to Mot. for Summ. J. at 5). The *Lederman* court addressed – and rejected – a similar argument, finding that in the situation before it, the LCD was sufficiently specific to support FCA liability for non-compliance. 2014 WL 1910096 at * 4. The court explained that a Medicare program coverage criteria document that stated it would provide "some guidance" regarding coverage in the absence of an NCD did not imply that the LCD are merely advisory or not authoritative: "'guidance can be mandatory.'" *Id.* The court found that "the statement explains that LCDs are gapfiller: where there is no national rule, a local contractor may make its

---

uncover (and thus not pay) claims that were not reimbursable because they did not adhere to the relevant LCD. The district court dismissed the case, finding that the relator failed to state a claim that the defendant MAC knowingly processed payments it knew were not reimbursable. While the complaint was dismissed, the underlying assumption that LCDs were binding on providers and defined the scope of reimbursable procedures was not questioned. *Id.* at *3.

[5] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c13.pdf, visited on May 31, 2017.

own rules." *Id.* In support of that analysis, the *Lederman* court cited to statutory and administrative texts which describe LCDs as explaining "whether or not a particular item or service is covered on an intermediary-or carrier-wide basis . . . in accordance with [the determination of what is "reasonable and necessary" under] section 1395(a)(1)(A)." The court stated that "the text gives no indication that particular LCDs are anything other than conclusive on matters they address." *Lederman,* 2014 WL 1910096 at *4. We agree.

Relator also points to a sentence in the Medicare Program Integrity Manual that says "LCDs do not address fraud" (Resp. to Mot. for Summ. J. at 5). But, that statement is written as an instruction in the drafting guidelines for MACs that create the LCDs, which encourages MACs to describe non-covered items discovered on post-payment review as being not "reasonable and necessary" rather than as "fraudulent billing." We read the instruction as reflecting that the submission of a claim that is "false" (*i.e.,* being made for services not reasonable and necessary under the LCD) is not automatically "fraudulent" (*i.e.,* a claim submitted with knowledge of its falsity). The language on which defendants rely does not suggest that the guidelines in LCDs are merely discretionary, or that the failure to adhere to them could not be the basis for a claim under the FCA.

Because we conclude that LCDs are binding, we reject defendants' contention that the four treatments at issue are reimbursable simply because Dr. Sklar considered them medically reasonable and necessary. The *Lederman* court addressed this same argument, explaining that it was up to HHS and its designees (the MACs) to decide what types of treatment will be covered. Any other result would render the claims process unnecessary. *Lederman,* 2014 WL 1910096 at *6, *citing United States v. Vascular Solutions, Inc.*, 1:10-cv-00883-SS, ECF No. 44 at *7

(W.D.Tex. March 7, 2013) ("If physician determinations of reasonableness and necessity controlled claim payment, there would be no need for a claim reimbursement process at all").[6]

**B.**

Having found that the LCDs are binding and may provide the basis for a claim submission of false claims under the FCA, we turn to relator's motion for summary judgment. We deny relator's motion for summary judgment, because there are genuine disputes of material fact about whether defendants have knowingly submitted false claims for reimbursement. The following facts are undisputed except where noted.

Relator is a licensed medical doctor (Resp. to RSOF ¶ 1). Between July and October 2007, relator worked at Foot First Podiatry, LLC ("Foot First"), the business owned by defendant Sklar, who is a licensed podiatrist (ASOF ¶¶ 1, 2, 4; Resp. to RSOF ¶ 3).[7] Neither party describes with any specificity the activities or medical treatments Dr. Youn performed or observed while he worked at Foot First. He contends that defendants have submitted false Medicare claims to the government for Doppler, ultrasound, wart removal and neurolysis.

Before we can address whether the treatments for which defendants sought reimbursement complied with the requirements of the LCDs, we must discuss a more basic issue: whether relator has successfully shown that defendants *submitted* allegedly false claims to the government. Defendants' chief billing specialist is Melissa O'Keefe (Resp. to RSOF ¶ 15). She acknowledges submitting claims for treatment provided by defendants to Medicare at various

---

[6] Defendants also argue (without authority) that the very fact that an LCD has been retired "raises reasonable questions why," apparently suggesting that failure to follow an LCD that is applicable at the time a claim is submitted but that is later retired should not lead to FCA liability (Resp. to Mot. for Summ. J. at 5-6). We have found no law to support this contention, and we reject it.

[7] The parties dispute the exact nature of Dr. Youn's relationship with Dr. Sklar during the four months he spent at Foot First clinics. Relator contends he was an employee of Dr. Sklar during that time, but Dr. Sklar contends that Dr. Youn was merely "associated" with him (Resp. to ASOF ¶ 1). As relator's exact employment status is not material to our determination, we need not address this issue further.

10

times; Dr. Sklar himself also testified that he submits claims for procedures such as bilateral ultrasounds to Medicare (*Id.* at 17, 18, 19). Ms. O'Keefe's declaration acknowledges that she submitted reimbursement claims to Medicare pursuant to Medicare guidelines and asserts that these submissions adhered to LCD guidelines, although she does not describe with any specificity the steps she took to submit a specific claim to Medicare, or the steps she or Dr. Sklar took to insure that the claim met LCD guidelines.

For his part, relator states merely that "[d]efendants have agreed, as a condition of participation in the Medicare program, to comply with the government's regulations, and *not* bill for medically unnecessary or non-compensable procedures. *See* Exh. A, Form 1500 certification" (Reply in Support of Summ. J. at 2) (emphasis in original). Relator does not explain the significance of Form 1500 or the link between it and defendants' submission of allegedly false claims. Therefore, while we find that the specific details of defendants' submission of claims to the government are fuzzy, the parties do not dispute the basic fact that defendants submitted claims for reimbursement to Medicare for the four types of treatments at issue here, thereby satisfying the submission of claims element of 31 U.S.C. § 3729(a)(1)(A).

That finding does not end our analysis regarding defendants' submission of claims. While there is no dispute that defendants submitted claims to Medicare for reimbursement, the parties vigorously dispute how many claims, among all those that defendants submitted, are included in relator's allegations of falsity. Relator does not describe the method by which defendants submitted their claims to the government or explain exactly what in each submission was "false." Relator points to two document sets that he alleges show the claims defendants submitted to Medicare: (1) four spreadsheets of claims – one for each of the four treatments at issue – that relator identified in response to defendants' Interrogatory No. 2 as representing all of defendant's

allegedly false Medicare claims, and (2) "Exhibit 5," a dense spreadsheet produced by CMS in response to a subpoena, which purports to show *every* claim defendants submitted to Medicare for the four treatments at issue during the relevant time period (RSOF ¶ 16, Exh. 5).

In their response to the RSOF, defendants move to strike Exhibit 5 pursuant to Fed. R. Civ. P. 56(c)(2), which allows a party to object that an asserted fact (here, that defendants submitted particular claims to Medicare and that these claims are false) is not supported by admissible evidence. Specifically, defendants argue that relator failed to lay an evidentiary foundation for Exhibit 5, and has not offered any explanation or interpretation of the data in it. Defendants also complain relator never identified this spreadsheet in any of his discovery responses, despite being served with Interrogatory No. 2, which asked him to list every purported false claim in the case (Resp. to RSOF at ¶ 16, Resp. to Mot. for Summ. J. at 2). Defendants argue that the four shorter spreadsheets relator prepared as part of his answers to Interrogatory No. 2, and not Exhibit 5, form the universe of purported false claims submitted to Medicare. While defendants raise a number of objections to these spreadsheets as well, they acknowledge that they were produced during discovery and that defendants had a chance to use them and ask questions about them during the deposition process.

In his reply, relator states that Exhibit 5 is a valid and accurate data set that defendants received in a timely manner but "chose to ignore" (doc. # 216: Relator's Reply at 2). Relator also contends that it does not matter whether the evidence of claims submitted to the government appears on Exhibit 5 or on the four smaller spreadsheets he prepared as part of his answers to interrogatories, because they both show false claims submitted by defendants to Medicare.

We agree with relator that he does not need to lay a foundation for exhibits offered in support of summary judgment as long as the exhibits are capable of being presented in an

admissible form at trial, such as by having a competent witness testify to lay a foundation for the document. *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). Nonetheless, we grant defendants' motion to strike Exhibit 5 because relator failed to identify it in discovery as a basis for his claims.

Interrogatory No. 2 asked relator to "identify each false or fraudulent claim or false record or statement that you contend the Defendants knowingly presented or caused to be presented, or knowingly made, used, or caused to be made or used, in violation of the [FCA] . . ," along with the factual basis for asserting that each claim was false (Resp. to Rel. Mot. for Summ. J., Exhibit 1). In his sworn response to that interrogatory, relator provided the four spreadsheets. We recognize that relator did not obtain Exhibit 5 from CMS until after he answered this interrogatory and that relator later gave Exhibit 5 to defendants after he received it. But, the spreadsheets and Exhibit 5 do not contain identical information, and relator only identified the spreadsheets in his discovery responses.

To the extent that relator asserts (*see,* Reply at 2) that Exhibit 5 expands the number of false claims from those discussed in the interrogatory answer, he had an affirmative duty to timely supplement that answer once he knew the original answer was incorrect or incomplete. Fed. R. Civ. P. (26(e)(1)(A); *see also, Jones v. National Council of Young Men's Christian Ass'ns of the U.S.,* No. 09 C 6437, 2011 WL 3273868, at *3 (N.D.Ill. July 28, 2011) ("[U]nder Federal Rule of Civil Procedure 26(e), each party has a duty to timely amend and/or supplement their responses to discovery if they obtain additional information or know that a response was incorrectly made"). Relator did not later amend that interrogatory response and has offered no good reason for failing to do so. Moreover, we find that defendants would be prejudiced by allowing relator now, well after discovery has closed, to expand the scope of false claims he

alleged in his interrogatory response. As a result, we strike Exhibit 5 from the summary judgment submissions and bar use of it at trial. *See,* Fed. R. Civ. P. 37 (c)(1) (providing that where a party violates the duty to supplement, that party "is not allowed to use that information . . . in a motion, at a hearing, or at trial unless the failure was substantially justified or is harmless").

## C.

We next consider whether relator has shown that the undisputed material facts show that defendants submitted false claims for reimbursement and knew they were false. In their response to the motion for summary judgment, defendants contend generally that the treatments were medically necessary and conformed to the LCDs. Defendants further contend that to the extent any of the treatments did not conform to the applicable LCDs, Dr. Sklar performed the work despite knowing that he may not get reimbursed because in his experience, it was the best course of action to treat the patient's underlying medical condition (Resp. to Mot. for Summ. J., Exh 2, ¶ 6.) Dr. Sklar also states that although he might submit a claim that did not conform to the applicable LCD, he did so because (1) Medicare regulations required the submission, or (2) a patient requested that he submit the claim because the patient needed documentation of the rejection before agreeing to pay for the services (*Id.* at ¶ 13).

As we have explained above, the Court finds that the LCDs establish what is reasonable and necessary treatment for a procedure they cover, and that submission of a claim that fails to conform to an applicable LCD constitutes a false claim. Thus, any argument by defendants that a claim is not false simply because they disagreed with the LCD is foreclosed. As for the suggestion that Medicare required defendants to submit claims that did not comply with an LCD, defendants have cited to no regulation or other requirement by Medicare to do so. While

defendants point to the "other comments" section of one LCD (L28178, pertaining to nonvascular extremity ultrasound) as "obligating" Dr. Sklar to bill Medicare for an uncovered service (Resp. to Mot. for Summ. J. at 14), we disagree that the cited language supports such a requirement. That section of the LCD states that "[l]imitation of liability and refund requirements apply when denials are anticipated, whether based on medical necessity or other coverage reasons," and that a provider is required to notify a patient in writing if the provider "is aware that the test, item or procedure may not be covered by Medicare" (Mot. for Summ. J., Exh. 10). Nothing in that section requires a provider to submit non-conforming claims to Medicare or absolves a provider from liability for violating the FCA for submitting a claim for treatment the provider knows is not reimbursable. However, since we find for other reasons that relator's FCA claim cannot be resolved on summary judgment, at trial we will not bar defendants from offering evidence of such a regulation or requirement if it exists; defendants' mere say-so will not be sufficient to present to the jury.

In addition, we reject the proposition that defendants may insulate themselves from FCA liability by placing the burden on the government to ferret out non-reimbursable claims from among the enormous volume of claims the government receives. Indeed, a recent district court case suggests that, given the vast number and complexity of reimbursement claims any particular MAC receives, it is not reasonable to expect a MAC to be able to cull out every wrongly submitted claim; such a burden should fall to the individual treatment providers instead. *United States ex rel. Baer,* 2016 WL 1259432 *at* * 2.

In any event, the ability of Medicare to discover that any particular claim fails to conform to an LCD is beside the point. The issue for FCA purposes is the defendants' knowledge: whether the evidence shows that a defendant knowingly submitted a claim that was not

reimbursable (that is, he had actual knowledge, deliberate indifference or reckless disregard for the truth that the claim was not reimbursable). *Universal Health Services, Inc. v. U.S.,* 136 S.Ct. 1989, 1996 (2016) (what matters for FCA liability is "whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision"). Defendants have provided no legal authority for the proposition that they may avoid liability under the FCA if they knowingly submitted non-reimbursable claims to Medicare and trusted that the government would find and refuse to pay those that do not comply.

We now turn to consideration of what the applicable LCDs say about the four treatments at issue, and whether relator has succeeded in showing that based on the undisputed material facts, defendants have knowingly submitted claims for treatment that did not conform to those LCDs.

### 1. Doppler

We deny summary judgment on relator's Doppler claims because there is a genuine question of material fact about whether defendants' use of the Doppler conformed to the relevant LCD. That LCD, L28586, became effective May 18, 2009 and was retired on September 30, 2015 (Mot. for Summ. J. Exh. 6). Therefore, it was in effect during at least some of defendants' submissions of allegedly false claims. The LCD states:

> Noninvasive Vascular Studies: are medically necessary only if the outcome will potentially impact the clinical management of the patient. Services are deemed medically necessary when all of the following conditions are met:
>
> 1. Signs/symptoms of ischemia or altered blood flow are present;
> 2. The information is necessary for appropriate medical and/or surgical management;
> 3. The test is not redundant of other diagnostic procedures that must be performed.

Another section of this LCD states that "noninvasive studies of the arterial system are utilized when invasive correction is contemplated and to follow medical treatment regimes" (Resp. to RSOF ¶ 20). The LCD further states that a peripheral arterial evaluation may be indicated where there is "anticipation of a surgical procedure where vascular disease is suspected" (*Id.*). Dr. Sklar testified at his deposition that he routinely performed a Doppler examination on all of his surgical patients prior to performing surgery (Resp. to RSOF ¶ 22). For example, prior to performing bunion surgery on Medicare patient "H.M.," Dr. Sklar performed a Doppler examination on her feet in 2014, while the LCD was in effect (Resp. to RSOF ¶ 30).

Relator's argument that defendants violated the FCA by failing to use certified Doppler technicians is a non-starter. LCD L28586 states that the accuracy of non-invasive vascular studies "depends on the knowledge, skill, and experience of the technologist and interpreter. Consequently, the physician performing and/or interpreting the study must be capable of demonstrating documented training and experience and maintain any applicable documentation" (Resp. to RSOF ¶ 23). Relator has pointed to no evidence that the LCD or Medicare regulations require some sort of certification, or that such certification even exists. Nor has he produced any evidence to demonstrate that the individuals who performed or read Doppler examinations on behalf of defendants were not so qualified. The fact that Dr. Sklar's associate, podiatrist Nicholas Ruckman, testified that he could not read a Doppler print out is irrelevant, given Dr. Ruckman's additional testimony that he did not perform Doppler examinations on patients (Resp. to RSOF ¶ 27).

Dr. Sklar argues that the LCD language saying that a Doppler examination is reasonable and necessary when "invasive procedure (*i.e.,* surgery) is contemplated" shows that his practice of performing a Doppler for every pre-surgical patient conformed to the LCD (Resp. to Mot. for

Summ, J. at 6). That interpretation is certainly not the only way to read the LCD, and may not be the best interpretation – for example, the LCD also says a pre-surgery Doppler may be used where "vascular disease is suspected," and we wonder whether that is invariably true for all surgical patients. But, if Dr. Sklar's interpretation is plausible, a jury may conclude that his submission of Doppler claims to Medicare was not knowingly false. *U.S. ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir. 1999) (differences in interpretation growing out of a disputed legal question are not false under the FCA). We conclude that the reasonableness of his interpretation is best left to the jury.

Moreover, even if defendants' interpretation is rejected, there remains a question as to whether Dr. Sklar's practice of performing Doppler examinations violated LCD L28586 in connection with every pre-surgical patient for whom he submitted a claim. One part of the LCD states that Doppler examinations are only considered medically necessary when "signs/symptoms of ischemia or altered blood flow are present." Combined with Dr. Sklar's practice of performing a Doppler examination on every pre-surgical patient, one may surmise, as does relator, that some of these patients did not have signs or symptoms of altered blood flow. But surmise is not substitution for evidence at summary judgment – or at trial. We cannot tell from the exhibits relator attaches to his motion whether there is evidence to show whether any patient who received Doppler examinations – and for which challenged claims were submitted to Medicare – had signs or symptoms of ischemia or altered blood flow. At trial, relator will have the burden of proving that the use of a Doppler examination on any particular patient failed to conform to the LCD.

## 2. Ultrasound

We next consider relator's claim that defendants' claims for ultrasound reimbursement did not adhere to L28178, entitled "Nonvascular Extremity Ultrasound." The LCD states that "bilateral studies are allowed only if there is pathology of both extremities . . . It is not reasonable and necessary to perform the contralateral extremity studies as a 'control'" (Resp. to RSOF ¶ 31). The LCD also states that "[i]n the case of plantar fasciitis, diagnostic ultrasound is NOT to be used in making an initial determination (diagnosis) and then should ONLY be used after a failed course of conservative management" (*Id.* ¶ 32) (emphasis in original). At his deposition, Dr. Sklar testified that with respect to diagnostic ultrasounds, he always performs a comparison study (*Id.* ¶ 34).

One patient on whom Dr. Sklar performed a bilateral ultrasound was V.M. (Resp. to RSOF ¶ 36). Dr. Sklar contends that his medical records for treatment of this patient show that his use of bilateral ultrasound prior to treating V.M. for plantar fasciitis was in accordance with LCD L28178 and was otherwise medically reasonable and necessary (*Id.*). Defendants' medical expert, Jondelle Jenkins, D.P.M., opines in her report that bilateral ultrasound are necessary to insure that the patient has a true pathology, and that it is needed for diagnosis of plantar fasciitis for most effective treatment of that condition (Resp. to Mot. for S. J., Exh. 3). Dr. Jenkins does not specifically address whether Dr. Sklar's use of ultrasound complied with LCD L28178.

Although it is a close question, we deny summary judgment on the issue of defendants' submission of claims for bi-lateral "control" ultrasounds. The language of the LCD plainly states that ultrasounds used for control purposes are not reimbursable and Dr. Sklar testified that he routinely performs bi-lateral ultrasounds as a control study. But relator has presented no evidence that defendant's submission of these claims was knowingly false; indeed, Dr. Sklar submitted a

19

declaration describing his belief that his use of bilateral ultrasound conformed with Medicare regulations.[8] The court in *Lederman* similarly reserved the issue of knowledge for trial, noting that "the issue of knowledge or recklessness might look different on a fuller record with the benefit of live testimony." 2014 WL 1910096 at * 8. In addition, even if Dr. Sklar's reading of the LCD is wrong, we do not know if his general practice nonetheless conformed to the LCD in some instances for specific patients. Proof of that subject will have to await trial.[9]

### 3. Neurolysis

Neurolysis involves the injection of an alcohol solution into a patient's foot, with the intended purpose of destroying the medial calcaneal nerve, and thus, ideally eliminating the patient's foot pain (Mem. in Support of Mot. for Summ. J. at 11). LCD L30153, which covers "injections – tendon, ligament, ganglion cyst, tunnel syndromes and Morton's Neuroma," states that the use of injections to treat these conditions will be considered medically reasonable and necessary to relieve pain (and thus are covered), when (1) "other conservative therapy has not provided acceptable relief, is contraindicated or not appropriate," or (2) "when there is a reasonable likelihood that the injection will significantly improve the patient's pain and/or functional disability" (Resp. to RSOF ¶ 38). Dr. Sklar contends that his use of neurolysis for

---

[8] While Dr. Sklar acknowledges his deposition testimony, he also points to the declaration he submitted in opposition to relator's motion for summary judgment, in which he discusses – at length – his belief that his use of bilateral ultrasound for every patient was in compliance with the LCD and Medicare billing practices. For example, he points to the "Indications" section of the LCD and contends that his use of bilateral ultrasound conforms with part 3 (extremity ultrasound is indicated to evaluate tendons, joints, plantar fascia, ligaments, soft tissue masses, ganglion cysts, intermetatarsal neuroma and stress fractures), and part 4 (extremity ultrasound is indicated to aid in the diagnosis of and surgical removal of foreign bodies. We do not find that Dr. Sklar's declaration creates a question of fact or otherwise contradicts his deposition testimony that he performs a bilateral ultrasound on every patient for whom he treats with an ultrasound, or that the applicable LCD allows for the use of bilateral ultrasound only in particular situations. However, we find it does create a question of fact as to whether he knowingly submitted claims that were not reimbursable under LCD 28178.

[9] The opinion of defendants' expert, Dr. Jenkins, that Dr. Sklar's use of ultrasound was medically reasonable and necessary does not create a fact issue. In light of our finding that the LCD imposes specific guidelines for determining whether ultrasound treatments are reasonable and necessary, her opinions, untethered to the language of the LCD, are not relevant.

treating patients' heel pain conforms with the requirements of this LCD (Resp. to RSOF ¶¶ 38-40).

Relator contends that the treatment is not covered because it is "experimental," citing to 42 U.S.C. 1395y(a)(1)(D) for the proposition that Medicare "does not cover or compensate for experimental and investigational techniques" (Mem. in Support of Mot. for S.J. at 11). However, the section of the Medicare law on which relator relies merely says that items excluded from coverage include "clinical care items and services provided with the concurrence of the Secretary and with respect to research and experimentation conducted by, or under contract with, the Medicare Payment Advisory Commission, which are not reasonable and necessary to carry out the purpose of [another section of the law not applicable to this case.]" 42 U.S.C. 1395y(a)(1)(D). Relator does not explain why Dr. Sklar's neurolysis treatments fall under this exclusion. The LCD itself does not specify whether alcohol injections to destroy a particular nerve in the foot are covered, and says nothing about whether this procedure is considered experimental.

Relator's only "evidence" that this type of treatment is experimental is a 2006 correspondence between Dr. Sklar and another podiatrist who had written about the use of alcohol injections to eliminate heel pain; at the time, the other podiatrist responded that there had not been a lot written on the treatment (Resp. to RSOF ¶ 39). Relator provides no support for his contention that this correspondence (or the alleged dearth of publications about the treatment) establishes that the treatment was experimental. Moreover, in his declaration, Dr. Sklar cites to a number of articles that do discuss and approve of the use of an alcohol solution to treat heel pain (Resp. to Mot. for S.J. Exh. 3). We find that, with respect to the use of Dr. Sklar's use of

neurolysis to treat heel pain, there is a dispute of material fact about whether this treatment is experimental.

Relator also claims that the procedure fails to conform to LCD L30153 because Dr. Sklar's experience showed there was not a reasonable likelihood the injections would provide pain relief. Relator cites Dr. Sklar's testimony that approximately three out of five of his patients experience pain relief from the alcohol injections as evidence that the treatment does not meet the "reasonable likelihood" standard of the LCD. Relator does not cite to any evidence of what level of success a "reasonable likelihood" requires. And, a full review of Dr. Sklar's testimony on the matter reveals that 95 percent of his patients respond to other treatments and are not treated with neurolysis. Thus, only five percent of Dr. Sklar's patients with heel pain underwent neurolysis (Mot. for S.J. Exh. 2). Whether a 60 percent success rate for the five percent of patients who did not obtain relief from other treatments constitutes a "reasonable likelihood" of success is a question for trial.

### 4. Wart Removal

LCD L27362 discusses when treatment to remove a wart is covered by Medicare (Resp. to RSOF ¶ 43). Under the heading "utilization guidelines," the LCD states that "clinically, it would not be expected that any given lesion would have to be treated more than once in a six months interval. The intrinsic nature of the lesion will determine whether more frequent treatments are required" (*Id.*). The parties dispute whether there is a maximum number of acid treatments for recalcitrant warts that meets the definition of medically necessary or what that number might be for any particular patient. While relator argues that Dr. Sklar violated Medicare guidelines by continuing to use (and bill for) acid treatments on warts after the treatment was no longer working, we find that the LCD does not specifically define a ceiling threshold for the

22

number of reimbursable treatments. We find there to be a dispute of fact on the issue of what number of wart treatments for any particular patient may have exceeded the scope of "medically reasonable and necessary" and thus deny summary judgment on this issue.[10]

### III.

Defendants' motion for summary judgment on Count II argues that the plain language of the IICFPA bars relator's claim that defendants have committed insurance fraud against private insurers. Relator quarrels with defendants' statutory interpretation, and also argues that there is a triable issue as to whether defendants submitted claims for treatments that were not reasonable and necessary. As we explain below, we disagree with defendants' statutory interpretation, but find relator has not demonstrated a triable issue on the contention that defendants submitted false claims in violation of the IICFPA.

### A.

As relevant here, Section 5 of the IICFPA titled "Patient and Client Procurement," 740 ILCS 92/5, creates liability in two circumstances. Subsection (a) makes it unlawful to offer or pay a "kickback" in order "to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance." 740 ILCS 92/5(a). This subsection goes on to state that "[n]othing in this Act shall be construed to affect any contracts or arrangements between or among insuring entities including health maintenance organizations, health care professionals, or health care facilities which are hereby excluded." *Id.* Relator does not allege a violation of this subsection.

---

[10] Relator cites testimony by defendants' expert that suggests she would have tried a different treatment for a particular patient that apparently received 26 acid treatments. Relator does not identify the patient or any medical records in support of this testimony, and we find that it is insufficient to establish on summary judgment that Dr. Sklar violated the LCD with respect to claims submitted for wart removal procedures.

Subsection (b) creates a private cause of action against any entity that violates the Illinois criminal code relating to insurance fraud. 740 ILCS 92/5(b). The criminal law referenced in subsection (b) states that a person commits insurance fraud when he "knowingly obtains . . . or causes to be obtained, by deception, control over the property of an insurance company . . . by the making of a false claim or by causing a false claim to be made . . . intending to deprive an insurance company . . . of the use and benefit of that property." 720 ILCS 5/17-10(a)(1).

Defendants' motion for summary judgment on Count II argues that the exemption in subsection (a) precludes relator's IICFPA claim for a violation of subsection (b) because, in their view, the Act "exempts claims submitted and handled pursuant to contracts between healthcare professionals and the private insuring entities involved in this case" (Def. Mot. for Summ. J. at 3). Defendants point out that all contracts between insurers and providers contain the requirement that treatment be "medically necessary" to be reimbursable. Therefore, defendants argue, any alleged failure of defendants to adhere to the requirement of medical necessity in performing treatment or submitting claims constitutes at most a breach of contract, and not a fraud (Mem. in Support of Summ. J. at 4-5).

In response, relator argues that the exemption only applies to the anti-kickback subsection in which it is found, and is intended only to prevent payments made to a legitimate economic arrangement (*e.g.*, a contract) between a health care provider and an insurer from being deemed an unlawful kickback (Rel. Resp. to Mot for Summ. J. at 4-5). Relator asserts that the exception in subsection (a) does not immunize an entity from violating subsection (b) by submitting claims to private insurers for treatments that were not medically necessary. Relator argues that if accepted, defendants' argument that all contracts between healthcare providers and

insurers are exempted from the IICFPA would render the law a nullity, as every relationship between healthcare provider and insurer is governed by a contract (*Id.*).

Few cases mention, let alone interpret, the IICFPA, and we have found none discussing the exemption. In *United States ex rel. Zverev v. USA Vein Clinics of Chicago, LLC,* 12 C 8004, -- F.Supp.3d. --, 2017 WL 1148468 at *6-7 (N.D.Ill. March 27, 2017), the relator alleged that the defendant doctor performed treatments that were not medically necessary in violation of the FCA, the Illinois False Claims Act, and the IICFPA, but those claims were dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because the relator did not identify with any particularity which requests for reimbursement were for medically unnecessary treatment; the case did not cite the subsection (a) exemption as another possible justification for dismissal. In *Zverev,* the court did allow federal and state law claims that defendant billed for procedures not performed to go forward, but again, without discussion of the IICFPA. *Id.* at *5.

We agree with relator that the contract exemption in subsection (a) does not bar outright claims for insurance fraud brought pursuant to subsection (b) of the IICFPA. "As in any case of statutory construction, our analysis begins with the language of the statute." *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438 (1999) (internal quotation marks omitted). We begin by looking broadly at the structure of the statute to acquire an understanding of the activity that it regulates. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute[ ]...." *Dolan v. United States Postal Serv.,* 546 U.S. 481, 486, (2006), *Maracich v. Spears,* 570 U.S. ___, 133 S.Ct. 2192, 2203 (2013) (interpretation of a phrase of uncertain reach should look to entire object and policy behind the statute).

Contrary to defendants' argument, the exemption most reasonably refers to the sentences immediately preceding it in subsection (a), which address unlawful insurance kickbacks and the

need to prevent legitimate patient procurement contracts between insurers and providers from being deemed unlawful by the prohibition against kickbacks. Defendants' suggestion that any allegation of insurance fraud that includes a reference to the contract between insurer and provider would be barred, because the suit could "affect" the contract between provider and insurer, sweeps too broadly. Such a reading would render the IICFPA provisions against insurance fraud nearly impotent, which certainly cannot be the result intended by the Illinois legislature. *U.S. v. Berkos,* 543 F.3d 392, 396 (7th Cir. 2008) (courts should avoid interpreting a statute in a way that renders a phrase meaningless).

## B.

That said, while we disagree with defendants' interpretation of the IICFPA, relator's Count II has a different problem. Relator contends that defendants have committed insurance fraud by submitting claims for medically unnecessary procedures to private insurance companies. The fraud is perpetrated, relator argues, by the fact that insurers cannot tell from the Form 1500s they receive that the underlying treatment identified on the form was actually not needed or was otherwise inappropriate (Rel. Mem. in Resp. to Mot for Summ. J. at 8).[11]

Count II fails because relator has presented no evidence by which we can link his allegations of medically unnecessary treatments to specific standards from any private insurer to which defendants submitted claims. Among other deficiencies, relator has not provided the Court with the names or number of the private insurers that were allegedly defrauded, or the standards by which each of those insurers measures medical necessity. Nor does relator present evidence

---

[11] Relator contends that the alleged fraud is perpetrated not only because the underlying treatments were not medically necessary, but also because the procedures as performed "were not designed to help patients, and submitted under legitimate codes to unsuspecting insurers" (Relator's Resp. to Mem. in Support of Summ. J. at 8). Relator provides no evidence of such coding fraud and we find this allegation to be nothing more than a restating of the same medical necessity allegations in the remainder of his complaint.

that all insurers use an identical definition of "medically necessary" for a given treatment. Medical diagnoses and treatment protocols can be complex, and may reasonably be subject to differing opinions as to what is reasonable and necessary in a given situation. Relator presents no evidence to demonstrate that the concept of "medical necessity" is a fixed star and that all payors agree about what treatments are reimbursable under given circumstances.

Relator contends that he "has cited to and quoted various insurers' standards of medical necessity in making his arguments that Defendants are performing medically useless and unnecessary procedures" (Rel. Resp. to Motion for Summ. J. at 10). However, relator does not cite to any specific insurance contract in making that argument, and the Court cannot find one in relator's papers. Relator says that "[i]t is also useful to show that under defendants' contracts, a comparison ultrasound study can serve no purpose in diagnosing a common foot inflammation, or that a useless and experimental alcohol injection produces no results is not good medicine" (*Id.*). But as to what contracts relator refers, the Court can only guess; he identifies none.

If relator had specific contracts between defendants and insurers on which to base his argument, the summary judgment motion was the time to present them. *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it'") (*internal citations omitted*). Without a measurable standard, such as the LCDs in the Medicare context, we find no basis for the relator to present at trial a claim for violation of the ILFCPA.

Nor is Count II saved by the conflicting expert opinions about whether each of the four treatments at issues is medically necessary. Again, in the absence of discernable standards about what any particular insurer considers a medically necessary (and thus reimbursable) treatment under the specific insurance contracts, the differing expert opinions do not create a question of

fact for trial. To hold otherwise would open up any healthcare provider to claims of insurance fraud based solely on the opinion of a medical expert about whether the treatments given were medically necessary.

We find that relator has not created a triable issue on his state law claims that defendants submitted fraudulent claims to private insurers for the four treatments at issue. We therefore grant defendants' motion for summary judgment on Count II.

## IV.

Finally, defendants move for summary judgment on Count III of the complaint, which alleges that defendants committed spoliation of evidence by destroying certain medical records relevant to the case. Specifically, relator argues that defendants committed spoliation by shredding medical records in October 2013, and also by allegedly colluding with another podiatry clinic to have it shred additional medical records in December 2013.[12]

In Illinois, a claim for spoliation of evidence is a subset of negligence, and requires the plaintiff to prove (1) a duty to preserve the evidence, (2) a breach of that duty by loss of the evidence, (3) that the loss proximately caused the plaintiff to be unable to prove his underlying claim, and (4) actual damages as a result. *Schaefer v. Universal Scaffolding & Equipment, LLC* 839 F.3d 599, 608 (7th Cir. 2016).[13] In Illinois, there is no general duty to preserve evidence; the duty arises only if two conditions are satisfied. The first condition arises through the relationship between the parties, such as by contract, agreement, statute, special circumstances, or voluntary undertaking. *Dardeen v. Kuehling*, 821 N.E.2d 227, 231 (Ill. 2004). The second condition is one

---

[12] We note that during the summary judgment briefing, relator moved to voluntarily dismiss Count III without prejudice (doc. # 197), and withdrew that motion only when defendants argued that the dismissal should be with prejudice (doc. # 206).

[13] Relator frames his spoliation argument as one of intentional, not negligent, spoliation of evidence (Rel. Reply to Def. Mot. for Summ. J. at 12-13) even though his Fourth Amended Complaint asserts both negligent and intentional spoliation (4th Am. Cmplt. ¶ 157). However, Illinois does not recognize a cause of action for intentional spoliation *Borsellino v. Goldman Sachs Group, Inc,.* 477 F.3d 502, 510-11 (7th Cir. 2007).

of foreseeability, that is, whether a reasonable person could have foreseen that the evidence was material to a civil action. *Dardeen*, at 231. Both conditions must exist to demonstrate that a duty to preserve evidence existed. *Id.*

Relator's claim for spoliation fails because he offers no evidence to create a jury issue as to whether defendants destroyed documents they had a duty to preserve. That is, relator fails to offer evidence that either he and defendants had a relationship that would create such a duty, or that, at the time the documents were shredded, it was reasonably foreseeable they would be material to this lawsuit. Relator's theory that defendants destroyed evidence they had a duty to preserve rests on his interpretation of a number of documents regarding the shredding of medical records in 2013. Despite relator's attempts to suggest suspicious or nefarious purposes behind the timing of defendant's disposal of documents in October 2013, we find no evidence that this activity were anything more than a routine business action.

*First*, there is no dispute that the complaint, filed under seal in 2010, was unsealed on November 4, 2013, and that defendants were served with it on December 5, 2013. There is no evidence that prior to December 5, 2013, defendants were aware of this suit. Furthermore, the undisputed evidence shows that defendants' engaged a third-party company to shred documents on October 11, 2013 (Reply in Support of Summ. J., Exh.1/2). Relator has offered no evidence to show defendants knew of this lawsuit in October 2013, and thus had a duty to preserve the documents that were shredded at that time.

*Second,* relator provides no evidence to support his allegation that defendants colluded with another podiatry clinic, also named "Foot First," to destroy relevant medical records in December 2013, shortly after defendants were served with the complaint. Relator speculates that collusion occurred because the owner of the other Foot First clinic – Dr. Warheit – was affiliated

with Dr. Sklar in the 1990s. In an employment discrimination case from 1995, the district court found that Dr. Sklar had primary supervisory authority over a number of Foot First clinics, including one where Dr. Warheit worked. Defendants do not deny that they were once affiliated with Dr. Warheit, but explain in a declaration that the relationship ended years ago when Dr. Sklar sold several of his podiatry clinics and allowed the purchaser to retain the "Foot First" name; that defendants have never maintained medical records at Dr. Warheit's facility; and that defendants had nothing to do with Dr. Warheit's shredding of documents in December 2013 (Defs.' Reply in Supp. of Summ. J., Exh. 2 ¶¶ 24, 29).

Relator has offered no evidence to contradict defendants' declaration. He offers no testimony or documentary evidence to show a business relationship between Dr. Sklar and Dr. Warheit as of December 13; 2013; or that Dr. Warheit had any knowledge of this lawsuit as of that date or that Dr. Sklar asked Dr. Warheit to shred the documents or in any way influenced his decision to do so. Instead, relator offers supposition that, because Drs. Sklar and Warheit were affiliated in the 1990's, because Dr. Warheit's Foot First also used Shred It to purge medical records, and one of those purges occurred around the time relator first filed an appearance in this case, Dr. Warheit *must* have possessed relevant medical records and then destroyed them on orders from defendants (Rel. Reply at 7). Realtor's suspicions do not come even close to creating a triable issue that defendants had a duty to preserve the medical records they shredded. While a splatter paint technique was successful when employed by a talented artist such as Jackson Pollock, throwing supposition against the wall in the hopes that it will stick is no substitute for evidence. Without evidence that relevant records were destroyed by defendants (or at their behest) when they had a duty to preserve them, a claim for spoliation cannot stand. We therefore grant defendants' motion for summary judgment on Count III.

## CONCLUSION

For the foregoing reasons, we: (1) deny relator's motion for summary judgment on Count I (doc. # 193); and (2) we grant defendants' motion for summary judgment on Count II with respect to alleged violations of the IICFPA, and as to Count III's claim of spoliation of evidence (doc. # 191). We dismiss those claims with prejudice. We set the matter for a status hearing on September 12, 2017 at 9:00 a.m. for the purpose of discussing with the parties whether what remains of the case can be settled and, if not, then setting this matter for trial.[14]

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:  August 7, 2017**

---

[14] Because we grant summary judgment for defendants on Count II, we deny as moot relator's motion to exclude the report of defendants' expert, William Hager (doc. # 180). Mr. Hager's intended testimony related only to the contractual relationship between providers and private insurers with respect to the submission of claims; he did not provide an opinion about the submission of claims to Medicare. With the allegations alleging insurance fraud against private insurers removed from the case, there is no need for an expert opinion on that issue.